UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CITIZENS HEALTH CORPORATION by: | ) | |
| Lula Journey, Chair, Citizens Health | ) | |
| Corporation Board of Directors, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| KATHLEEN  SEBELIUS Secretary, US | ) | |
| Department of Health and Human Services, | ) | |
| US DEPARTMENT OF HEALTH AND | ) | |
| HUMAN, HEALTH RESOURCES | ) | No. 1:12-cv-00748-SEB-TAB |
| ADMINISTRATION, | ) | |
| JAMES D. MINER, M.D. Chair, Board of | ) | |
| Trustees of the Health & Hospital Corporation | ) | |
| of Marion County, IN, | ) | |
| MATTHEW  GUTWEIN Executive Director, | ) | |
| Health & Hospital Corporation of Marion | ) | |
| County, IN, | ) | |
| HEALTH & HOSPITAL CORPORATION OF | ) | |
| MARION COUNTY, INDIANA, | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED ORDER ON PENDING MOTIONS**[1]

This cause is before the Court on Defendants' Motion to Dismiss [Docket No. 42], filed

on August 20, 2012; Defendants' Motions for Summary Judgment [Docket Nos. 54 and 57],

filed on September 25, 2012; and Plaintiff's Motion to Strike [Docket No. 79], filed on

---

[1] This entry is issued merely to correct the spelling of Defendant James D. Miner's name.  In the original entry, Defendant Miner's name was spelled "Minor," as it was listed on the caption on the Court's docket.  However, on November 30, 2012, after our original entry was issued, Defendants filed a Motion to Amend the Order to reflect the correct spelling.  This entry is otherwise identical to the original entry at Docket No. 82.

November 9, 2012.[2]  Plaintiff Citizens Health Corporation ("Citizens") brings this action against Defendants Health Resources and Services Administration ("HRSA")[3] and the Secretary of Health and Human Services ("HHS" or "the Secretary") (collectively, "the Federal Defendants") alleging violations of its procedural and substantive due process rights.  Citizens also alleges a state law breach of contract claim against Defendants Health and Hospital Corporation of Marion County, Indiana ("HHC"); James D. Miner, M.D., Chair of the Board of Trustees of HHC; and Matthew Gutwein, Executive Director of HHC (collectively, "the HHC Defendants").

On June 1, 2012, Citizens filed a Motion for Preliminary Injunction [Docket No. 4], but failed to file a brief in support of that motion until September 4, 2012.  Subsequently, a preliminary injunction hearing was set for October 29, 2012.  However, on October 17, 2012, the Court vacated the preliminary injunction hearing in order to permit the pending summary judgment motions to become fully briefed and ruled upon.  The fully briefed summary judgment motions are now before the Court for our decision.

**Factual Background**

This litigation involves a dispute regarding a "Section 330" grant from the United States Health Resources and Services Administration ("HRSA"), an agency of the Department of Health and Human Services ("HHS").  The "Section 330" designation refers to Section 330 of the Public Health Service Act, 42 U.S.C. § 254b ("the Act").  Through the Section 330 grant program, HRSA provides funding for the costs of operation of public and nonprofit private entities ("health centers") to provide primary health care services to medically underserved populations.  At issue in this litigation is the Section 330 grant which provides funds for

---

[2] On October 31, 2012, Plaintiff also filed a Motion for Leave to Amend Affidavit of Karen M. Scrougham [Docket No. 74].  That motion is hereby GRANTED.
[3] HRSA is an operating division of the United States Department of Health and Human Services.

community health care in a particular geographic area of Indianapolis, Indiana ("the catchment area").

For a number of years, Citizens, a not-for-profit Indiana corporation, had been the sole operator of a federally qualified health center[4] ("the Health Center") providing primary healthcare services to the catchment area with financial support from the federal Section 330 grant.[5]  However, in 2001, due to managerial and financial difficulties facing Citizens, the HRSA transferred the Section 330 grant to Defendant Health and Hospital Corporation ("HHC"), a municipal corporation established pursuant to Indiana Code § 16-22-8,[6] and Citizens became a co-applicant for these funds with HHC.

Over the ensuing approximately eleven years, as co-applicants, Citizens and HHC jointly applied for and received Section 330 funds.  The Section 330 grants issued throughout that time period designated HHC as the grantee of record, making HHC accountable to HRSA for management of the grant funds.  Pursuant to a series of affiliation and co-applicant agreements, Citizens was responsible for providing the primary health care services designated in the Section 330 grants.  Since 2001, Citizens and HHC have entered into five successive co-applicant agreements which define and govern their relationship as it pertained to administration of the Section 330 grants.  These co-applicant agreements were each published to and administratively approved by HRSA.

---

[4] A federally qualified health center ("FQHC") is a type of primary health care provider defined by the Medicare and Medicaid statutes and includes all organizations receiving grants under Section 330.  A FQHC Look-Alike is an organization that meets all of the eligibility requirements of an organization that receives Section 330 grant funding, but does not receive a Section 330 grant.

[5] The health center's federally approved scope includes a site at 1650 North College Avenue in Indianapolis as well as another site located in Barton Annex, a housing complex administered by the Indianapolis Housing Authority. Am. Compl. ¶ 10.

[6] HHC operates both a division of public health, the Marion County Health Department, and a division of public hospitals, Wishard Health Services.

The Section 330 grant at issue in this litigation is for a term of four years expiring on or about February 28, 2016.  When HHC applied for the grant, a program narrative was submitted with the application that identified HHC and Citizens as co-applicants, under the project title "Citizens Health Corporation."  A.R. at 135.  The program narrative identified HHC as the grantee of record for the grant funds and acknowledged that HHC maintained fiscal oversight for the Section 330 grant.  A.R. at 146, 173.  At the time HHC filed the grant application, the relationship between HHC and Citizens was governed by a Co-Applicant Agreement that the parties had entered into in the fall of 2008 for the period of November 14, 2008 through February 28, 2011.  Under the terms of that Agreement, HHC's responsibilities included "[r]eceiving, managing and disbursing Section 330 grant funds consistent with the Health Center's budget approved in accordance with this agreement" and ensuring that Citizens "receives Section 330 grant funds for current month costs."  A.R. at 8.  HHC and Citizens agreed that "HHC shall have ultimate fiscal accountability for the Section 330 grant funds."  *Id.*

When the 2008 Co-Applicant Agreement expired in February 2011, HHC and Citizens did not immediately forge a new agreement.  The parties did not renew the co-applicant agreement that ended in February 2011 until HRSA forced the issue by informing the parties that, without a valid co-applicant agreement, the Section 330 grant was out of compliance.  Thus, HHC and Citizens entered into the most recent co-applicant agreement ("the Fifth Agreement") on September 23, 2011.  A.R. at 254-76.  Unlike their prior agreements, which had been multi-year agreements, the Fifth Agreement was for a one-year period (February 28, 2011 through February 28, 2012), renewable by the parties' mutual agreement for up to four additional one-year terms.  But like the parties' previous co-applicant agreements, the Fifth Agreement addressed, *inter alia*, the parties' joint operating goals, their respective roles and responsibilities,

4

and the operational and managerial structure used to administer the Section 330 grant. Pursuant to the Fifth Agreement, Citizens was responsible for most of the day-to-day operating functions of the Health Center, and HHC was responsible for managerial functions, including but not limited to approval of Citizens' annual budget, lease agreements, and disbursements of funds. A.R. at 262-64.

Differing views between HHC and Citizens regarding the future direction for the health center contributed to the parties' delay in signing the new co-applicant agreement after the previous agreement had expired. On November 9 and 10, 2011, HRSA[7] conducted a site visit of HHC and Citizens in an attempt to mediate their differences. Following the visit, HRSA issued a Consolidated Team Report ("the Report") detailing the purpose of the visit and the results of the mediation. A.R. 331-348. Based on conversations with a number of individuals associated with both parties, the report stated that, although both HHC and Citizens had clearly indicated their commitment to continuing services within the catchment area, each had different views as to the manner in which that could best be accomplished. A.R. at 333.

HHC's opinion was that services would be provided most effectively by bringing Citizens into the HHC system of health centers and obtaining federally qualified health center status for the system as a whole. As an alternative, HHC indicated a willingness to continue the co-applicant arrangement with Citizens and to apply for look-alike status for its other ten clinics, with a separate board of directors. However, HRSA informed HHC that HRSA policies prohibit one organization from having both a Section 330 co-applicant and a look-alike with separate boards. A.R. at 339. Thus, HHC regarded its only options to be deciding whether to continue

---

[7] The Bureau of Primary Health Care, an organizational component within HRSA, was the entity who conducted the site visit.

the co-applicant relationship with Citizens or to sever the relationship in order to apply for look-alike status for the ten clinics it operates.  *Id.*  Citizens, on the other hand, believed it could best serve the catchment area by maintaining local community governance of the clinic, whether through a continuation of the co-applicant arrangement with HHC, and a reversion to its previous status as an independent Section 330-funded health center, or by entering into a new partnership as a sub-recipient to another federally qualified health center.  A.R. at 333, 340.

Following its site visit, HRSA recommended that HHC and Citizens continue to meet to discuss options to preserve health services for the catchment area.  The Report described a variety of potential options for going forward that had been discussed during the site visit, while making clear that no final commitments had been made.  The Report further noted: "Short of relinquishing the 330 grant, which HHC can do without HRSA approval, both HHC and Citizens are aware that any compromise proposal will require HRSA[] review and approval."  A.R. at 341.

In addition to their divergent views regarding the future direction for the Health Center, other disagreements between HHC and Citizens existed.  HHC contends it was concerned about Citizens's financial stability for several reasons, based on the findings of a 2009 audit performed by the accounting firm Blue & Co., LLC, which detailed problems with financial and accounting controls, including material weaknesses in a number of areas; Citizens's subsequent failure to address the issues identified by the audit; and Citizens's failure to provide HHC with audits from 2010 or 2011 or unaudited financial statements that HHC had requested.  HHC alleges that it was also concerned that Citizens was not complying with a condition HRSA had placed on the 2011 grant requiring Citizens to "provide documentation to demonstrate that the governing board is functioning appropriately and in accordance with program requirements."  A.R. 387.

6

Given these concerns, HHC proposed to Citizens a change in the parties' operations along lines similar to those addressed in HRSA's site visit report, to wit, that Citizens's board act as the governing board for HHC's existing network of ten primary care facilities, thereby enabling those facilities to be operated as part of the Health Center's scope of project and receive the benefits of being designated a federally qualified health center.  Citizens and HHC never reached agreement on HHC's proposal, however, or on any other arrangement pursuant to which Citizens would affiliate with HHC's other health centers.

In response, HHC informed Citizens by letter dated January 11, 2012, that, unless they were able to reach consensus regarding these outstanding issues, HHC planned to "inform HRSA that it intends to terminate the [Section 330] grant."  A.R. at 351.  As promised, two days later, on January 13, 2012, HHC notified HRSA that it intended to terminate the Section 330 grant and that it would provide a transition plan by February 1, 2012.  A.R. at 360.  On February 1, 2012, HHC sent the grant relinquishment notification to HRSA.  A.R. at 362-65.  HRSA subsequently notified HHC that it required additional documentation from HHC before relinquishment of the grant could be processed.  In response, on February 14, 2012, HHC sent HRSA its "Notice of Relinquishment of Interest in the Section 330 Grant Awarded to the Health & Hospital Corporation of Marion County and Citizens Health Corporation (Notice of Grant Award # 6 H80CS00592-10-06)."  A.R. at 376-79.  In its notice, HHC informed HRSA that it intended to relinquish its interest in the Section 330 grant as of November 30, 2012, "prior to the end of the current project period of February 28, 2016."  A.R. at 376.  On February 28, 2012, shortly after HHC notified HRSA that it was relinquishing the Section 330 grant, the Fifth Agreement governing the co-applicant relationship between HHC and Citizens expired with HHC declination to renew for an additional one-year term.  A.R. at 272.

On February 14, 2012, Citizens was notified of HHC's decision to relinquish the grant by receipt of a copy of the notification HHC sent to HRSA.  A.R. at 375, 379.  By letter to HRSA dated March 25, 2012, Citizens objected to HHC's relinquishment of the Section 330 grant and "respectfully request[ed] that it assume the role as the Grantee through 2016."  A.R. at 389.  Citizens has acknowledged that it was "aware of the significance of this request."  *Id.*  On April 3, 2012, counsel for Citizens, Aaron Haith, submitted questions to HRSA for review by the HHS Office of the General Counsel seeking advice and guidance regarding various issues, including the availability of administrative remedies in cases "where the grantee (HHC) wants to either subsume or eliminate its known co-applicant while using the known fact that Citizens relied upon the grant at least through [February] 2016" as well as the availability of sanctions in cases in which "the local tax supported Grantee intentionally cause[s] the interruption of a grant, the demise of its co-applicant … thus interfering with the delivery of primary health care services to the community."  A.R. at 410.  Mr. Haith also indicated that he believed there was precedent for a co-applicant's assumption of the role of grantee "where untenable circumstances arose due to the conduct of the grantee."  A.R. at 411.

HRSA responded to Citizens by letter dated May 7, 2012, advising Citizens that it [HRSA] was working closely with HHC to ensure a continuation of health care services within the catchment area and a smooth close out of the grant.  In that letter, HRSA notified Citizens that "[a] Funding Opportunity Announcement will soon be released for the service area currently served by the grantee" that "you [Citizens] may apply … [for] if you meet the eligibility requirements for a Health Center grant."  A.R. at 412.

On June 1, 2012, Citizens filed its Complaint in this litigation.  One week later, on June 8, 2012, Citizens filed its Amended Complaint for Preliminary Restraining Order and for

Temporary and Permanent Injunction, alleging procedural and substantive due process violations against the Federal Defendants and alleging a breach of contract claim against the HHC Defendants.  Currently pending are the following motions: Plaintiff's Motion for Preliminary Injunction; Defendants Gutwein and Miner's Motion to Dismiss; the Federal Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment; the HHC Defendants' Motion for Summary Judgment; and Plaintiff's Motion to Strike.  We address these motions in turn below.

## Legal Analysis

### I.    The Federal Defendants

Citizens seeks judicial review of the Federal Defendants' decision to accept HHC's voluntary relinquishment of the Section 330 grant.  The Federal Defendants have lodged the relevant administrative records with the court and have filed a motion for summary judgment.  In cases such as this, where the court's task is to review an administrative record and apply the appropriate legal standards to that record, summary judgment is an appropriate vehicle for deciding the case.  *Mahler v. United States Forest Serv.*, 927 F. Supp. 1559, 1562 (S.D. Ind. 1996) (citing *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994)).  The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, sets forth the applicable scope of review for administrative decisions like that at issue here.

### A.    Standard of Review

Under the APA, a district court reviews the agency's action to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Applying this standard requires the court to evaluate whether the agency's decision

"was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (citation omitted). The scope of the court's review under the arbitrary and capricious standard is "narrow" and the court "is not to substitute its judgment for that of the agency." *Judulang v. Holder*, 132 S.Ct. 476, 483 (2011) (citations omitted).

### B.    Discussion

Citizens argues that it was denied its due process rights because it was not afforded notice or an opportunity to be heard before the Federal Defendants accepted HHC's voluntary relinquishment of the Section 330 grant. Citizens maintains that the implementing regulations require both co-applicants to agree to relinquish a Section 330 grant, and thus, the Federal Defendants lacked authority to terminate the grant award unless and until Citizens and HHC mutually agreed to terminate the grant, which Citizens never agreed to do. According to Citizens, the Federal Defendants improperly treated Citizens and HHC as separate entities when terminating the grant, when they should have considered them as a single entity.

We are not persuaded by Citizens's argument. The administrative record makes clear that, at all times relevant to the dispute currently before us, HHC was the sole grantee of record of the Section 330 grant at issue. The grant award clearly referenced HHC as the grantee. Supp. A.R. at 460. Throughout the administrative record, the parties consistently referred to HHC as the grantee, reflecting all parties' apparent understanding of that fact. *See, e.g.*, A.R. at 18 (memorandum from Citizens referring to HHC as grantee of record), A.R. at 20 (Citizens CEO acknowledging that HHC was the grantee of record for Citizens), A.R. at 173 (program narrative submitted in support of Section 330 application, stating that HHC is grantee of record), A.R. at

332 (report following site visit identifying HHC as grantee and Citizens as the co-applicant), A.R. at 389, 397 (letters from Citizens requesting that it be allowed to assume the role of grantee of record).

Moreover, the Co-Applicant Agreement governing during the relevant time period states that Citizens "desires to avail itself of HHC's medical management expertise without compromising [its] integrity, independent, autonomy, and overall control of its operations."  A.R. at 2.  There simply is nothing in the record to indicate that Citizens and HHC had at any time become a single legal entity or ever operated as such.  To the contrary, the parties' Co-Applicant Agreement plainly identifies HHC and Citizens as separate and distinct legal entities, to wit, referencing HHC as a municipal corporation created by state law and Citizens as a nonprofit charitable corporation.  A.R. at 2.

Although it is true that Citizens was designated a co-applicant and was reimbursed by HHC for its services from the grant funds, pursuant to the terms of the parties' co-applicant agreement, Citizens has failed to show that its status as a co-applicant conferred upon it any legal rights under Section 330 of the Public Health Service Act or under the implementing regulations with regard to the voluntary relinquishment of the grant by the grantee that would entitle it to the relief to which it claims it was lawfully entitled.  In its response to the Federal Defendants' motion for summary judgment, Citizens states that "42 C.F.R. § 50.402 is specifically the relief requested by Citizens."  Docket No. 73 at 2.  However, what is not clear is why Citizens believes that § 50.402 is applicable to our case.

Section 50.402 provides as follows: "This subpart applies to all grant and cooperative agreement programs, except block grants, which are administered by the National Institutes of

Health; The Centers for Disease Control and Prevention; the Agency for Toxic Substances and Disease Registry; the Food and Drug Administration; and the Office of Public Health and Science. For purposes of this subpart, these entities are hereinafter referred to as 'agencies.'" 42 C.F.R. § 50.402. Citizens fails to explain how § 50.402 applies to the parties' dispute, given that HRSA is not among the agencies listed in detailing the scope of that section. *See* 42 C.F.R. § 50.401 ("This subpart establishes an informal procedure for the resolution of certain postaward grant and cooperative agreement disputes *within the agencies and offices identified in § 50.402*) (emphasis added).

Citizens argues that it was entitled to notice and a hearing prior to termination of the Section 330 grant at issue by the Federal Defendants. However, Citizens cites no regulation, rule, or statute providing for an administrative hearing or other relief when a grantee voluntarily terminates the grant. The parties dispute whether the administrative procedures laid out in 45 C.F.R. Part 92 or Part 74 apply to the Section 330 grant at issue. The Federal Defendants maintain that Part 92 applies, which "establishes uniform administrative rules for Federal grants and cooperative agreements and subawards to State, local and Indian tribal governments." 45 C.F.R. § 92.1. Local government includes "any agency or instrumentality of a local government." 45 C.F.R. § 92.3. The Federal Defendants contend that it is the grantee's status that determines which administrative procedures apply, and that, because HHC, the grantee here, is a municipal corporation, the procedures set forth in Part 92 apply to the Section 330 grant at issue. In contrast, Citizens argues that its status as a not-for-profit community center is determinative and thus that 45 C.F.R. Part 74 supplies the applicable administrative procedures. Part 74 lays out the administrative requirements governing HHS grants, subgrants, or subawards

issued to "institutions of higher education, hospitals, [and] other nonprofit organizations" as well as certain commercial organizations. 45 C.F.R. § 74.1.

Resolving this precise dispute is in any event unnecessary because our analysis reflects that the result is the same regardless of whether 45 C.F.R. Part 92 or Part 74 applies to the issues before us. Subpart 92.3 defines "termination" as the "permanent withdrawal of the authority to obligate previously-awarded grant funds before that authority would otherwise expire. It also means the voluntary relinquishment of that authority by the grantee or subgrantee."[8] 45 C.F.R. § 92.3. Similarly, under Subpart 74.2, "[t]ermination means the cancellation of HHS awarding agency sponsorship, in whole or in part, under an agreement at any time prior to the date of completion," 45 C.F.R. § 74.2. Both Part 92 and Part 74 provide that a grant may be terminated by the grantee or recipient upon sending to the HHS awarding agency written notification "setting forth the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated." 45 C.F.R. § 92.44(b); 45 C.F.R. §74.61.

Most importantly, under both Part 92 and Part 74, only in cases in which the Secretary takes an enforcement action for the recipient's material noncompliance with a term or requirement of an award do the regulations provide for an opportunity for a hearing or other administrative proceeding before the termination of the award. *See* 45 C.F.R. § 92.43(a) and 45 C.F.R. § 74.62(a)(3) (both listing "termination" as an available remedy for noncompliance through an enforcement action); 45 C.F.R. § 92.43(b) and 45 C.F.R. § 74.62(b) (both providing that, "*in taking an enforcement action*," the awarding agency will provide the grantee or recipient "an opportunity for such hearing, appeal, or other administrative proceeding to which the

---

[8] There is no contention that Citizens is a subgrantee or the beneficiary of a subgrant as those terms are defined in Subpart 92.

[grantee or recipient] is entitled under any statute or regulation applicable to the action involved.") (emphasis added).  Neither Part 92 nor Part 74 provides for similar administrative procedural protections in the case of a voluntary relinquishment of grant funds.

Here, HHC, the grantee, provided HRSA with written notification of its voluntary relinquishment of the Section 330 grant at issue.  Citizens has failed to adduce any evidence to establish that the Secretary's acceptance of that relinquishment without a hearing somehow violated the implementing regulations or other applicable rule or statutory provision.  Nor has Citizens pointed us to any regulation, rule, or statutory provision providing that the Secretary has jurisdiction, let alone a duty or obligation, to adjudicate legal issues arising between a grantee and a co-applicant such as those at issue here.[9]  Without such, Citizens is unable to show that the Federal Defendants' actions were arbitrary, capricious, or contrary to law.[10]

Nor has Citizens established that it has a protectable property interest in continued Section 330 funding to support a Fifth Amendment due process claim.  It is well-established that under the Fifth Amendment Due Process clause, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citation and internal quotation marks omitted). Property interests "are created and their dimensions are defined by existing rules or

---

[9] There are administrative procedures applicable to certain types of disputes arising under the Section 330 grant program, which are set forth in 45 C.F.R. Part 16.  *See* 45 C.F.R. § 16.1.  However, arbitrating disputes between a grantee and a co-applicant is not listed.  *See* 45 C.F.R. Part 16, Appendix A.

[10] Citizens has submitted several documents outside of the administrative record, including the Affidavit of Lulu Journey, the Second Affidavit of Lulu Journey, and the Affidavit of Karen Scrougham.  In challenges to a final agency action, the court's review is limited to the "administrative record already in existence" and discovery is inappropriate in all but exceptional cases.  *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted).  Because Citizens has made no attempt to establish that this is such an exceptional case, we have not considered the above mentioned evidence in our analysis of the Federal Defendants' motion.

understandings that stem from an independent source," such as statutes or regulations.  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  Moreover, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  *Castle Rock*, 545 U.S. at 756 (citation omitted).

Clearly, the Public Health Service Act does not mandate that the Secretary make Section 330 grants; to the contrary, the making of any such grants is vested in the Secretary's discretion.  *See*, *e.g.*, 42 U.S.C. § 245b(c)(1)(A) ("[T]he Secretary *may* make grants to public and nonprofit private entities for projects to plan and develop health centers which will service medically underserved populations.") (emphasis added).  Citizens has failed to put forth any argument on this issue.  Accordingly, Citizens has failed to establish that it has a protectable property interest in the Section 330 grant funds.

Citizens also has failed to counter the Federal Defendants' argument that Citizens claim for compensatory damages must be dismissed because it failed to establish a waiver of sovereign immunity that would subject the Secretary to a suit for damages. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.") (citations omitted).  Because Citizens did not address this argument, we consider it waived.  *United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) ("In [the Seventh Circuit], unsupported and undeveloped arguments are waived.") (citations omitted).

For the reasons detailed above, we therefore <u>GRANT</u> the Federal Defendants' Motion to Dismiss and/or in the Alternative for Summary Judgment.

## II.      The HHC Defendants

Before resolving the merits of the HHC Defendants' summary judgment motion, we turn

to consider two procedural matters.  Prior to filing their Motion for Summary Judgment [Docket

No. 57], Defendants Matthew Gutwein and James D. Miner, M.D. filed a Motion to Dismiss

[Docket No. 42], on August 20, 2012, pursuant to Federal Rule of Civil Procedure 12(b)(6).  In

response to that motion, Plaintiff submitted documents that were outside the pleadings.  Under

Federal Rule of Civil Procedure 12(d), "[i]f, on a motion under Rule 12(b)(6) …, matters outside

the pleadings are presented to and not excluded by the court, the motion must be treated as one

for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to

present all the material that is pertinent to the motion."  Deciding whether to receive matters

outside the pleadings on a Rule 12(b)(6) motion is a matter squarely within the discretion of the

court.  Because Defendants subsequently filed a motion for summary judgment that is now fully

briefed, to which all parties have had an opportunity to present pertinent material, we convert the

motion to dismiss to a summary judgment motion and consider all of the parties' arguments

under the summary judgment rubric.

The second procedural matter relates to Plaintiff's Motion to Strike.  The HHC

Defendants filed their motion for summary judgment on September 25, 2012.  The Federal

Defendants also filed a dispositive motion on that date.  On October 2, 2012, Citizens filed

"Plaintiff's Response to Defendants' Sebelius, HHS, HRSA, HHC, Miner and Gutwein's

Statements of Undisputed Facts or Facts Not in Dispute," which consisted of two attached

affidavits.  On October 26, 2012, the Court entered a scheduling order setting an October 26,

2012 deadline for Citizens to respond to the pending summary judgment motions and a deadline

of November 5, 2012 for the defendants' reply briefs.  On October 25, 2012, Citizens filed a

response brief entitled "Plaintiffs' Response to the Federal Defendants' Motion to Dismiss and/or in the Alternative for Summary Judgment."  Although Citizens did not file a separate response to the HHC Defendants' summary judgment motion, certain arguments set forth in its response to the Federal Defendants' motion reference the HHC Defendants and are potentially relevant to the HHC Defendants' motion.  On November 5, 2012, the HHC Defendants filed a response addressing: (1) the arguments raised in Citizens's response to the Federal Defendants' motion that referenced the HHC Defendants; and (2) the statements contained in the two affidavits constituting Citizens's response to all Defendants' undisputed facts.

On November 9, 2012, Citizens filed a Motion to Strike the HHC Defendants' reply in support of its summary judgment motion [Docket No. 79] arguing that it "chose to stand on its prior filings" with respect the HHC Defendants, and thus, that Defendant's reply brief was in violation of the Court's scheduling order, and was "impertinent … redundant, and immaterial." Docket No. 79 at 2.  However, in light of the fact that certain statements contained in Citizens's response brief filed in opposition to the Federal Defendants' motion specifically mentioned HHC and that the statements contained in the Citizens's affidavits were expressly captioned as a response to the HHC Defendants' facts, we find that the HHC Defendants' had a right to reply. Accordingly, we <u>DENY</u> Plaintiff's Motion to Strike.

## A.   Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict

for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure

18

to prove one essential element "necessarily renders all other facts immaterial."  *Celotex*, 477 U.S.
at 323.

### B.      Discussion

Although not entirely clear from the complaint, it appears that Citizens's only claim
against the HHC Defendants is its state-law claim for breach of contract.  Citizens alleges that
HHC breached the parties' Fifth Agreement by: (1) withdrawing or severely reducing technical
support to Citizens after Citizens declined to join HHC's ten existing health centers in an effort
to force Citizens to either join HHC's health centers or go out of business; (2) unilaterally
relinquishing the Section 330 grant funds; and (3) using its larger size and connections with
HRSA to replace Citizens as operator of the Health Center after "severely weaken[ing]" Citizens
and depriving the community of health care services.

### 1.      Defendants Miner and Gutwein

Although Citizens names Mr. Miner and Mr. Gutwein individually as defendants, it does
not allege that they were personally parties to any contract with Citizens.  If Citizens's actual
intent is to bring some other claim against Defendants Gutwein and Miner, perhaps based on
allegations that they took unauthorized actions, outside the scope of their employment, no such
claim has been adequately developed or argued in the record before us.  Accordingly, we
<u>GRANT</u> the HHC Defendants' Motion for Summary Judgment as to all claims against
Defendants Matthew Gutwein and James Miner, in their individual capacity.

19

### 2.    Defendant HHC

As against HHC, Citizens first claims that it breached the Fifth Agreement by
withdrawing and reducing technical assistance that HHC was required to provide under the terms
of the contract.  However, Citizens has not identified any specific technical assistance that was in
fact required under the contract which HHC has refused to provide.  The only portion of the Fifth
Agreement addressing technical assistance is quite limited, providing merely that HHC will
"[p]rovide technical assistance and advice to [Citizens's] CEO on matters concerning the
preparation of annual capital expenditures budget, assistance and development of efficient
accounting procedures and controls in accordance with generally accepted accounting
princip[les], billing procedures, collection procedures and other health center management
function assistance."  A.R. at 262-63.

Although Citizens has not specified the precise technical assistance it was allegedly
denied, there are certain documents in the record referencing Citizens's communications with
HRSA which indicate that HHC had not provided certain services, including insurance, bulk-
purchasing discounts, snow removal, lawn car, and security.  What is missing here is any
requirement in the Fifth Agreement that HHC provide such services.  Nor can it be argued that
such services impliedly come within the provision in the Fifth Agreement addressing technical
assistance.  As noted above, that provision is quite narrow, providing only that HHC was
obligated to provide technical assistance to Citizens's CEO on certain financial and accounting
matters.  Clearly, services such as snow removal, lawn care, and security do not fall within that
narrow scope.

20

In response to the HHC Defendants' statement of facts, Citizens submitted the affidavit of Karen Scrougham, Citizens's Interim Chief Executive Officer.  While that document contains a few general references to a lack of technical assistance provided by HHC, their vagueness makes them insufficient in withstanding summary judgment.  Citizens filed this affidavit without identifying the disputed facts which Citizens maintains preclude summary judgment or without any accompanying explanation regarding the significance of the facts that are contained there.  It is not the Court's responsibility to scour Ms. Scrougham's 44-page affidavit in search of the potentially relevant portions in an attempt to cobble together a winning argument for Plaintiff. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[I]t is not the obligation of [a] court to research and construct legal arguments open to parties, especially when they are represented by counsel.") (citation omitted); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried [in the record].").

The clear import of the evidence before us establishes that, throughout the parties' relationship, HHC provided financial support for upgrading Citizens's facilities, and technical assistance in the areas of finance and operations, legal, human resources, information technology, and grant writing.  The record also clearly and convincingly supports HHC's contention that it provided other forms of technical assistance as well, such as in advising Citizens to correct its audit conditions, in assisting Citizens with grant applications, and in monitoring certain filing and reporting deadlines for Citizens.  Given these facts, Citizens's efforts to establish that HHC breached the Fifth Agreement by failing to provide technical assistance required by the contract come up well short.

Citizens next alleges that HHC breached its contractual obligations when it voluntarily relinquished the Section 330 grant.  However, the Fifth Agreement, which governed the parties'

21

relationship, covered only a one-year term, renewable by the parties' mutual agreement.  Thus, both parties were clearly on notice that it was possible that their relationship would end following completion of the one year term, if either party chose not to renew.  Moreover, the Fifth Agreement contains no requirement that the grant be maintained for its full term, to wit, until February 28, 2016.  As discussed above, the implementing regulations allow a grantee to relinquish a grant before the end of the grant term, and Citizens has failed to put forth any evidence or argument otherwise.  Accordingly, we find that HHC's voluntary relinquishment of the Section 330 grant does not constitute a breach of the Fifth Agreement.

Finally, Citizens alleges that HHC used its economic superiority and alleged connections with HRSA to remove and replace Citizens as operator of the Health Center after "severely weaken[ing]" Citizens, thereby depriving the catchment area of the benefits flowing from $4 million federal dollars.  Again, in making this argument, Citizens fails to cite any provision in the contract that was breached, or, in fact, put forth any argument at all in support of these allegations.  As discussed above, the Fifth Agreement clearly provided that it would expire in February 2012 unless the parties both agreed to renew it for additional one-year terms.  HHC made no attempt to terminate the agreement before it expired; instead it merely declined to renew the contract, as was its right under the explicit terms of the agreement.  Moreover, as discussed in detail above, nothing in the Fifth Agreement or the governing federal regulations prevented HHC, as the grantee, from voluntarily relinquishing the Section 330 grant funds.

Citizens's claims that the catchment area will be deprived of the federal funds or that HHC was somehow precluded from applying for any future Section 330 grant that might be awarded to the community, while regrettable, if true, are equally unavailing.  On June 6, 2012, HRSA announced that a Health Center Program Service Area Competition would be held for the

catchment area and set August 15, 2012 as the closing date for applications to apply for the grant funding opportunity.  HRSA has indicated that it expects to award a new Section 330 grant for the area, which will be effective on December 1, 2012.  Accordingly, it appears that the community will not be deprived of Section 330 funding, as Citizens contends.  Any organization who meets the eligibility requirements can compete for the grant, and HRSA has advised both HHC and Citizens that they could apply for the successor Section 330 grant, if they meet the applicable requirements.  HHC has in fact submitted an application for the grant funds, and Citizens has not shown that HRSA has represented to HHC or in any other way guaranteed that HHC would be the successful applicant.  Further, there is no provision in the Fifth Agreement that prevents HHC – or Citizens, for that matter – from individually applying to be the successor grantee of the Section 330 funds.  The only contract terms governing the parties' post-termination conduct require that they maintain certain records, (§ 2.3.4.2), maintain certain insurance, (§ 2.3.5.7), and maintain confidentiality of certain documents, (§ 9.4), after the contract terminates.  A.R. at 264-266, 270.   These requirements are not implicated in the dispute before us.

For these reasons, we <u>GRANT</u> the HHC Defendants' Motion for Summary Judgment.

**III.    Conclusion**

For the reasons detailed above, we <u>GRANT</u> Defendants Miner and Gutwein's Motion to Dismiss [Docket No. 42] (which was converted to a motion for summary judgment); the Federal Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment [Docket No. 54]; and the HHC Defendants' Motion for Summary Judgment [Docket No. 57].  Plaintiff's Motion

to Strike [Docket No. 79] is <u>DENIED</u> and Plaintiff's Motion for Preliminary Injunction [Docket

No. 4] is <u>DENIED AS MOOT</u>.  Final judgment shall enter accordingly.

    IT IS SO ORDERED.


Date: _____12/21/2012_____


SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:


Aaron Edward Haith
CHOATE & HAITH
ahaith@sbcglobal.net

Harmony A. Mappes
FAEGRE BAKER DANIELS LLP - Indianapolis
harmony.mappes@faegrebd.com

Jon  Laramore
FAEGRE BAKER DANIELS LLP - Indianapolis
jon.laramore@faegrebd.com

Edward Todd Waters
FELDESMAN TUCKER LEIFER FIDELL LLP
ewaters@ftlf.com

Robert A. Graham
FELDESMAN TUCKER LEIFER FIDELL LLP
rgraham@ftlf.com

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov